## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALICIA WARD-JOHNSON,<br><br>　　　　　*Plaintiff,*<br><br>　　v.<br><br>C.D. GLIN,<br>President and Chief Executive Officer,<br>U.S. African Development Foundation,<br><br>　　　　　*Defendant.* | Civil Action No. 1:19-cv-00534 (CJN) |

## MEMORANDUM OPINION

*Pro se* Plaintiff Alicia Ward-Johnson, a former term employee at the U.S. African Development Foundation, alleges that her supervisors discriminated and retaliated against her on the basis of race, color, sex, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq. See generally* Compl., ECF No. 1. The Foundation moves to dismiss four of the Complaint's five counts. *See generally* Def.'s Partial Mot. to Dismiss, ECF No. 11; Def.'s Mem. of P. & A. in Supp. of Def.'s Partial Mot. to Dismiss ("Mot."), ECF No. 11-1. In turn, Ward-Johnson seeks to amend her Complaint to add a claim under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–34. *See generally* Pl.'s Br. in Supp. of Mot. to Amend Compl. ("Mot. to Amend"), ECF No. 15. The Court grants the Partial Motion to Dismiss in part, denies it in part, and denies Ward-Johnson leave to amend because her proposed amendment is futile.

### I.　　Background

Ward-Johnson is an African-American woman above the age of 40 who suffers from "high blood pressure and severe migraines." Compl. ¶ 10; EEOC Appeal of Dec. 12, 2018 ("1st

EEOC Appeal") at 1, ECF No. 1-2; Mot. to Amend at 2.[1]   The Foundation hired her on

November 15, 2015, as a GS-9 auditor through the Pathways Recent Graduates Program, an

entry-level hiring program.  Compl. ¶¶ 1, 46–47; 1st EEOC Appeal at 1.  These appointments are

not permanent; Ward-Johnson was hired "under a two-year term appointment" that was set to

expire on November 15, 2017.  1st EEOC Appeal at 6.  The job advertisement indicated that the

incumbent "may be non-competitively converted to the competitive service after successful

completion of at least one year of continuous service," in addition to other requirements.  *See* Job

Advertisement, ECF No. 13-1 at 22.

In December 2015, shortly after she joined the Foundation, Ward-Johnson began to feel

uncomfortable with the way her supervisor, Ellen Teel (a white woman), was treating her.

Compl. ¶¶ 2–3; Pl.'s Mem. of P. & A. in Opp'n to Def.'s Partial Mot. to Dismiss ("Opp'n") at 3,

ECF No. 13.  Teel's behavior included "[i]nappropriately calling [Ward-Johnson] after work

hours while intoxicated, calling [her] desk excessively and repeatedly during work hours,

keeping [her] in [Teel's] office for 2 to 3 hours at a time [to discuss Teel's personal life despite

Ward-Johnson's requests to go back to her desk], [and] following [her] to the restroom and other

areas within the building."  Compl. ¶ 3; Opp'n at 3.  Ward-Johnson communicated her

discomfort with the behavior to Teel repeatedly, but Teel "did not acknowledge it and continued

her pattern" of behavior.  Opp'n at 3.  Ward-Johnson alleges that these incidents were "a day to

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court may also consider materials Ward-Johnson attached to her Complaint, including records from the Equal Employment Opportunity Commission, *English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013), and supporting allegations contained in Ward-Johnson's briefing on the Motion to Dismiss, *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 151 (D.C. Cir. 2015).

day activity of Ms. Teel for most of [Ward-Johnson's] two[-]year tenure" at the Foundation, sometimes taking her away from her work for several hours of the day.  *Id.*

Ward-Johnson complained to a human resources liaison, Jennifer Barnes West.  Compl. ¶ 4.  West indicated that she was aware of similar complaints by "four to five previous" employees, all of whom were African American women who were later "fired by Ellen Teel or left the Agency voluntarily due to harassment."  Compl. ¶ 4; Opp'n at 3.  West then referred Ward-Johnson to the Foundation's president, Shari Berenbach, who expressed similar knowledge of the problem and promised to counsel Teel.  Compl. ¶¶ 4–6.

Berenbach suddenly passed away from illness in February 2016, and Teel's behavior continued unabated.  *Id.* ¶ 7.  Ward-Johnson again approached human resources to complain, so West forwarded her to the Foundation's general counsel, Doris Martin.  *Id.* ¶¶ 8–9.  Martin commented that she too was aware of previous issues and was concerned that "this is happening again."  *Id.* ¶ 9.  Ward-Johnson also indicated to Martin that the stress from her interactions with Teel was aggravating her high blood pressure and causing frequent illness.  *Id.* ¶ 10.  Ward-Johnson provided medical documentation and requested an accommodation for her alleged disability, asking that she be moved from an internal office with fluorescent lighting (which caused migraines) to an office with a window to provide natural light.  *Id.* ¶¶ 24–25.  Martin agreed to speak with Teel about the situation.  *Id.* ¶ 10.  Officials later explained to Ward-Johnson that she could not obtain an office with a window because her low pay-grade made her too junior for such an arrangement.  Opp'n at 5–6.  She alleges, however, that a male employee at the same grade already had such an office at the time.  *Id.* at 6.

Teel's behavior continued.  Compl. ¶ 11.  Ward-Johnson next approached the Foundation's acting president, Constance Newman, who once again sympathized with Ward-

Johnson but did not fix the problem.  *Id.*  Ward-Johnson then filed an informal equal employment opportunity claim with the Foundation in August 2016.  *Id.* ¶ 13.  The same month, she also took one week of sick leave on her physician's orders to recover from the stress she felt as a result of Teel's alleged harassment.  *Id.* ¶ 23.  Even then, Teel continued to call Ward-Johnson at home.  *Id.* ¶ 27.  On August 30, Ward-Johnson provided another physician's request asking that she move offices.  *Id.* ¶ 26.  On September 8, Ward-Johnson got ill and had to leave work to go to the emergency room.  *Id.* ¶ 28.  Physicians again put her on leave for a week.  *Id.* ¶ 29.  She provided the Foundation with more requests from both the emergency room doctor and her primary care physician asking that she move to a new office.  *Id.* ¶¶ 29–30.  The agency provided the accommodation upon Ward-Johnson's return from medical leave on September 19.  *Id.* ¶ 33.

Around that time, C.D. Glin took over as the Foundation's president.  *Id.* ¶ 14.  Ward-Johnson met with him to discuss the Teel matter on September 13, but Glin dismissed the issue and refused to discuss it.[2]  *Id.* ¶ 15.  In November, having received no assistance in changing Teel's behavior, Ward-Johnson formalized her administrative complaint.  *Id.* ¶ 36.  That month, she became eligible for conversion from a term appointment to a permanent position in the competitive service, but the Foundation took no steps to accomplish the conversion.  *See* 1st EEOC Appeal at 6; Compl. ¶ 38; Opp'n at 6.  Instead, unnamed persons informed Ward-Johnson that the Foundation planned to terminate her employment immediately (though that never happened).  Compl. ¶ 38.  Ward-Johnson alleges that, because she had filed a formal complaint,

---

[2] The Complaint's description of the meeting's timing is inconsistent.  Ward-Johnson states that she was on medical leave from September 8–16, 2016, *id.* ¶ 29, but also states that she met with Glin on September 13, *id.* ¶ 15.

her co-workers "would not invite [her] to certain meetings" and "began to mistreat [her] at work." *Id.* ¶ 39.

The situation went unresolved for several more months.  In April 2017, Glin, Chief Financial Officer Mathieu Zahui, and Arlene Williams held a private meeting, at which Glin stated that he wanted Ward-Johnson "out of the agency."  *Id.* ¶¶ 41–42.  Williams understood that remark to mean that the Foundation would allow Ward-Johnson's employment to expire at the end of her two-year term.  *Id.*  She quietly passed the news along to Ward-Johnson, asking Ward-Johnson not to tell anyone how she learned of the information.  *Id.*  Ward-Johnson attempted to amend her administrative complaint to add additional facts to her pending retaliation claim, but the investigation was nearly complete and the Foundation refused to accept additional allegations so late in the process.  *Id.* ¶ 43.  On August 2, 2017, the Foundation denied Ward-Johnson's administrative complaint.  *Id.* ¶ 44; 1st EEOC Appeal at 2.  Ward-Johnson appealed to the EEOC, which affirmed the denial.  1st EEOC Appeal at 7.

As Ward-Johnson's two-year anniversary at the Foundation drew near, Glin informed her that, due to "budgetary constraints," the Foundation had decided to permit Ward-Johnson's term to expire rather than convert her to a permanent position.  Compl. ¶ 46.  Ward-Johnson believed that the budget explanation was pretextual, in part because no other Pathways participant (all of whom were white) had been let go and in part because the Foundation was then advertising two new permanent positions.  *Id.*; Opp'n at 7.  She applied for one of the positions, a GS-11 Financial Management Analyst.  Compl. ¶¶ 47–48.  As part of her application, Ward-Johnson submitted documentation certifying that she was disabled and therefore eligible for a hiring preference.  *Id.* ¶ 47.  The hiring manager forwarded Ward-Johnson's application to Zahui, but he initially opted not to interview her.  *Id.* ¶ 50–52.  Ward-Johnson's term expired and she left

the Foundation.  *Id.* ¶ 52.  After she filed a second equal employment opportunity complaint alleging retaliation and disability discrimination with regard to her termination, Zahui agreed to interview her but ultimately hired someone else.  *Id.* ¶ 52; Opp'n at 8.  The Foundation denied the second complaint and the EEOC again affirmed.  *See generally* EEOC Appeal of Dec. 14, 2018 ("2nd EEOC Appeal"), ECF No. 1-3.

Ward-Johnson sued.  *See generally* Compl.  Her Complaint (augmented by her Opposition) contains five counts alleging claims under Title VII and the Rehabilitation Act:  (I) a hostile work environment created by Teel's behavior (race, color, sex), Compl. ¶¶ 1–22, Opp'n at 2–4; (II) failure to accommodate a disability, disparate treatment, and retaliation (disability, sex), Compl. ¶¶ 23–35, Opp'n at 4–6; (III) retaliation for requesting an accommodation and filing the first complaint (race, color), Compl. ¶¶ 36–45, Opp'n at 6–7; (IV) failure to hire (disability), Compl. ¶¶ 46–57, Opp'n at 7–8; and (V) failure to hire in retaliation for filing the second complaint, Compl. ¶¶ 58–71.  Ward-Johnson's Opposition also lists age discrimination as a factor in Count III, *see* Opp'n at 6, though the Complaint makes no mention of age.

The Foundation moves to dismiss Counts I–IV for failure to state a claim but does not yet challenge Count V.  *See generally* Mot.  In its Reply, the Foundation challenges Ward-Johnson's invocation of the ADEA because it was not contained in her Complaint.  *See* Def.'s Reply in Supp. of Def.'s Partial Mot. to Dismiss ("Reply") at 5–6, ECF No. 14.  To correct this deficiency, Ward-Johnson then moved for leave to amend her Complaint to add the ADEA claim as an additional basis underlying Count III.  *See generally* Mot. to Amend.  The Foundation opposes amendment, arguing that Ward-Johnson failed to exhaust administrative remedies as to any charge of age discrimination, so amendment would be futile.  *See generally* Def.'s Opp'n to Pl.'s Mot. to Amend Compl. ("Def.'s Opp'n"), ECF No. 17.

## II.     Legal Standard

### A.     Motion to Dismiss

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "When evaluating a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], the Court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (internal quotations and citations omitted).  Although the Court accepts all well pleaded facts in the Complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 554–55 (internal quotations and citations omitted).  The claim to relief must be "plausible on its face," enough to "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

In a typical suit, "[i]n determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  But the D.C. Circuit has instructed district courts to take a more lenient approach when evaluating a motion to dismiss a *pro se* plaintiff's complaint.  *See Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 151–52 (D.C. Cir. 2015).  Indeed, "a district court errs in failing to consider a *pro se* litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss." *Id.* at 152 (quoting *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999)).

As is the case with many *pro se* filings, Ward-Johnson's Complaint omits many factual details and lacks some of the nuance the Court would expect if she had had the assistance of counsel. *See generally* Compl. Her Opposition fills in some of the detail and gives the Court (and the Foundation) a better sense of her factual allegations and claims. *See generally* Opp'n. The Court therefore considers Ward-Johnson's pleadings "*in toto*" to determine whether she has adequately stated a claim for relief. *Brown*, 789 F.3d at 151. The Foundation "will suffer no prejudice by allowing [Ward-Johnson] to, in effect, supplement [her] complaint with the allegations included in [her] opposition." *Id.* at 152. However, the Court will not consider the filing Ward-Johnson submitted after briefing on the Motion concluded, as she did not seek leave to file a surreply and the Foundation was unable to respond to the new material she presented therein. *See generally* Pl.'s Reply in Opp'n to Def.'s Partial Mot. to Dismiss, ECF No. 16.

### B.      Motion for Leave to Amend Complaint

Ward-Johnson sought leave to amend her Complaint more than 21 days after the Foundation moved to dismiss, so she may not amend as of right. *See* Fed. R. Civ. P. 15(a)(1)(B). Instead, she may amend "only with the opposing party's written consent or the court's leave." *Id.* 15(a)(2). The Foundation opposes amendment. *See generally* Def.'s Opp'n. Although the "[C]ourt should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), justice does not *always* require the Court to grant leave to amend. "Leave may properly be denied if the proposed amendment is futile, such that it would not withstand a motion to dismiss." *Singletary v. Howard Univ.*, 939 F.3d 287, 295 (D.C. Cir. 2019) (internal quotations and citations omitted). The Court may also deny leave in the event of "undue delay, bad faith or dilatory motive on the part of [Plaintiff], . . . [or] undue prejudice to [Defendant]." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012).

### III.     Analysis

### A.  Motion to Dismiss

### 1.     Hostile Work Environment

In Count I, Ward-Johnson alleges that Teel created a hostile work environment by calling her after hours while intoxicated, following her around the building, and making her come to Teel's office to discuss personal matters for hours at a time.  Compl. ¶¶ 1–22; Opp'n at 2–4.  To prevail on such a claim, Ward-Johnson "must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), and that the harassment occurred because of Ward-Johnson's membership in a protected class, *Harris*, 510 U.S. at 21.  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 550 F.3d at 1201.

Sporadic incidents of rude or unprofessional behavior are not enough—severe or pervasive means just that.  *Barbour v. Browner*, 181 F.3d 1342, 1348–49 (D.C. Cir. 1999) (insulting gesture from a colleague and a supervisor's intentionally slow response to employee's question were insufficient to support a finding of hostile work environment); *see also Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006) (denied promotion, lower performance evaluations, demotion, and reduced autonomy insufficient); *Baloch*, 550 F.3d at 1201 (demanding medical documentation for all sick leave, threatening suspension, issuing letter of reprimand and unsatisfactory performance review, and "profanity-laden yelling" insufficient).  When allegations are successful, the abuse is usually quite severe.  *See, e.g., Singletary v. District of*

*Columbia*, 351 F.3d 519, 528–29 (D.C. Cir. 2003) (failure to promote, failure to provide necessary tools, relegation to an unheated and poorly lit storage room for a year and a half despite available office space, failure to create a job description and then measuring plaintiff's performance against arbitrary standards for six years *may* be sufficient); *Barbour*, 181 F.3d at 1348 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (repeated sexual assault enough), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) (employee granted promotion but denied corresponding raise on explicit racial grounds; supervisor screamed at plaintiff and yelled "get out of my office, [n*****]!"; employee then forced to continue working with supervisor).

The Foundation contends that Ward-Johnson's allegations, when taken together, do not reach the high bar plaintiffs must overcome to plead a hostile work environment adequately. *See* Mot. at 5 (citing *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016)). It argues that Ward-Johnson's characterization of the alleged harms is "far too vague and conclusory to support her claim that her working environment was 'permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* at 6 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Lumping Ward-Johnson's allegations together with the "'ordinary tribulations of the workplace' that courts routinely find 'are not actionable,'" Reply at 2 (quoting *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014)), the Foundation compares the situation to other cases in which supervisors have burdened employees with various administrative requirements in the office and in which courts have dismissed for failure to state a claim for a hostile work environment, *see id.* at 2 (citing *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing hostile work environment claim where plaintiff alleged "disparaging remarks, criticisms of his work, . . . other negative comments [,] . . .

removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management")).

Those arguments do not respond to the nature of Ward-Johnson's allegations.  Rather than claiming that she was subjected to "ordinary tribulations of the workplace," *Brooks*, 748 F.3d at 1277–78 , Ward-Johnson alleges that Teel *prevented* her from doing her work by calling her several times per day and making her come to Teel's office for hours on end to discuss Teel's personal life, Compl. ¶ 2; Opp'n at 3.  This behavior continued even after Ward-Johnson confronted Teel, told Teel that the actions made her feel uncomfortable, and asked Teel to leave her alone so that she could do her job.  Opp'n at 3.  Ward-Johnson also alleges that Teel stalked her around the office and regularly called her at home outside of working hours and even while Ward-Johnson was on medical leave.  *Id.*  Such behavior differs from cases in which supervisors criticize employees, selectively enforce rules against them, give them negative performance evaluations, assign them menial or unpleasant tasks, or make occasional discriminatory comments.  *See, e.g., Brooks*, 748 F.3d at 1275.  Courts rarely find that those sorts of allegations "meet the demanding standards of a hostile work environment," *Williams v. Spencer*, 883 F. Supp. 2d 165, 181 (D.D.C. 2012) (internal quotation omitted), which ensures "that Title VII does not become a general civility code."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation omitted).  Here, however, the alleged behavior does not fall into those categories.

The ultimate question is whether Teel's treatment of Ward-Johnson was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21.  The Foundation argues that, even if Teel's behavior were "'strange' or perhaps rude, courts have dismissed far ruder conduct as insufficient to constitute a

hostile work environment.'"  Mot. at 7.  To be sure, Teel's alleged actions may not be severe

enough to cross the threshold.  *See, e.g, Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C.

2008) (granting summary judgment to employer whose supervisor "called plaintiff into his office

numerous times a day, repeatedly called him on the phone, constantly sent him emails, . . .

charged him with [being absent without leave] and physically blocked his path when he sought

to leave the office" on hostile-work-environment claim).  But the Supreme Court's formula is

written disjunctively:  the alleged harassment must be either "severe *or* pervasive."  *Ayissi-Etoh*,

712 F.3d at 579 (Kavanaugh, J., concurring).  The D.C. Circuit there concluded that a single,

very severe incident was enough to state a claim.  *Id.*   Building on that concept, the Court later

held that "[s]everity and pervasiveness are complementary factors and often go hand-in-hand,

but a hostile work environment claim could be satisfied with one or the other."  *Brooks*, 748 F.3d

at 1276 (citing *Ayissi-Etoh*, 712 F.3d at 579 (Kavanaugh, J., concurring)).

Thus, even if Teel's alleged behavior wasn't severe enough to create a hostile work

environment, Ward-Johnson plausibly alleges that Teel's behavior was pervasive enough to cross

the line.  A supervisor who follows her African-American, female employees (including

Plaintiff) around the building all day, forces them into her office for hours without a work-related

purpose, and calls them in their homes in the evening to discuss personal matters may very well

have created a hostile work environment if the effect of such behavior is to "alter the conditions

of . . . employment" for her workers.  *Harris*, 510 U.S. at 23.  It may be the case that Ward-

Johnson will not be able to carry her burden of proof on summary judgment; the Foundation may

have an adequate, non-discriminatory explanation for Teel's behavior, Ward-Johnson's

allegations may not be entirely accurate, or there may be not be enough support for Ward-

Johnson's allegation that Teel acted because of Ward-Johnson's race or sex rather than merely

being an abnormal boss.  But because the Court must at this early stage "afford [Ward-Johnson] the benefit of all inferences that can be derived from the facts alleged," *Atlas Brew Works*, 391 F. Supp. 3d at 11, the Court concludes that Ward-Johnson, "as a *pro se* plaintiff, successfully 'nudged [her] claim[ ] across the line from conceivable to plausible," *Brown*, 789 F.3d at 152 (quoting *Twombly*, 550 U.S. at 570)).

### 2.      Disability Discrimination

The Complaint contains two separate claims alleging discrimination arising out of Ward-Johnson's claimed disability and attempts to secure an accommodation.  Count II alleges that Ward-Johnson first requested an accommodation for migraine headaches and hypertension in February 2016.  Compl. ¶ 25.  She made subsequent requests in August and September.  *Id.* ¶¶ 26, 29–31.  But the Complaint admits that she received the accommodation on September 19, immediately after returning from over a week of medical leave following her emergency room visit.  *Id.* ¶ 33.  In turn, Count IV alleges that the agency did not hire Ward-Johnson for the Financial Analyst position in late 2017 because she was a disabled applicant.  *Id.* ¶¶ 46–57.  The government responds that (1) Ward-Johnson has not properly alleged that she's disabled within the meaning of the Rehabilitation Act, Mot. at 9–11, and (2) the Complaint contains no allegation that Ward-Johnson's claimed disability played a role in her failure to get the job, *id.* at 11–13.

#### a.      Accommodation

The Rehabilitation Act guarantees that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, . . . be subjected to discrimination . . . under any program conducted by any Executive agency."  29 U.S.C. § 794(a).  The Act incorporates the Americans with Disabilities Act's (ADA) standards for disability discrimination.  *Id.* § 794(d).  The ADA in turn makes it unlawful to "discriminate against a

qualified individual on the basis of disability in regard to . . . the . . . advancement[] or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee" unless the employer "demonstrate[s] that the accommodation would impose an undue hardship on the operation of the business."  *Id.* § 12112(b)(5)(A).  To state a reasonable-accommodation claim, Ward-Johnson must plausibly allege that "(1) she was a qualified individual with a disability, (2) the [employer] had notice of her disability[,] and (3) the [employer] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).

"Not all individuals having what might commonly be perceived as physical or mental disabilities are protected by the [Rehabilitation] Act."  *Desmond v. Mukasey*, 530 F.3d 944, 952 (D.C. Cir. 2008).  To be considered an "individual with a disability" entitled to the Act's protections, one must have "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A); *see also* 29 U.S.C § 705(20)(B) (incorporating ADA's definition under the Rehabilitation Act).  In that context, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

The Foundation correctly contends that Ward-Johnson has not alleged that her migraines or hypertension "substantially limit[] one or more [of her] major life activities."  Mot. at 9 (quoting 42 U.S.C. § 12102(1)(A)).  Courts in this circuit have repeatedly dismissed disability

claims where there is no allegation that the claimed disability *substantially* limits a major life activity. *See Scott v. Dist. Hosp. Partners, L.P.*, 60 F. Supp. 3d 156, 164 (D.D.C. 2014) (finding no disability where plaintiff only suffered difficulty breathing when in a dirty, poorly ventilated office, as did her co-workers), *aff'd* 715 F. App'x 6 (D.C. Cir. 2018) (per curiam); *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 55 (D.D.C. 2015) ("plaintiff's complaint does not plausibly assert that he is disabled under the ADA because there is no allegation that his alleged 'anxiety disorder' substantially limits a major life activity"). Judge Leon recently dismissed a very similar case:

> Carter's amended complaint fails to specify any major life activity that is impacted by her various ailments [including asthma, hypertension (which caused blurred vision), a serious stomach disorder, kidney stones, and migraines]. Assuming I could overlook that failing—for example, by construing the invocation of 'migraine headaches' as an allegation that her condition limits mental concentration—the amended complaint still fails to allege facts from which I could infer that any major life activity is *substantially* limited, as required by the statute.

*Carter v. Carson*, 241 F. Supp. 3d 191, 196–97 (D.D.C. 2017), *aff'd*, 715 F. App'x 16 (D.C. Cir. 2018) (per curiam). Neither Ward-Johnson's Complaint nor her Opposition contains any details about how her hypertension and migraines substantially limit any major life activities. *See* Compl. ¶¶ 10, 23–35; Opp'n at 4–6.

Ward-Johnson significantly expands Count II's scope in her Opposition. *See* Opp'n at 5–6. She first argues that the Foundation's refusal to move her to a better office constituted disparate treatment on the basis of sex, because a male employee of the same pay grade had an office with a window. *Id.* at 5. To state a claim for sex discrimination under Title VII, Ward-Johnson must allege that "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that [her] employer took the action because of [her] membership in the

protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).  Although she has adequately alleged that she is a member of a protected class, Opp'n at 6, Ward-Johnson's accusation boils down to two sentences in her Opposition brief:  "The agency's reason for not moving me to the requested office was based on my GS-9 grade level; however, a male employee (sex) occupied the same size office with a window.  I am a female," *id.*  Because Ward-Johnson has not adequately alleged that she was entitled to the accommodation, there simply is not enough information in her pleadings to permit the Court to infer that the denial constituted an "adverse employment action" within the meaning of Title VII or that the Foundation denied the accommodation because of Ward-Johnson's sex.

Ward-Johnson next argues that her supervisors denied the accommodation in retaliation for her informal equal employment opportunity complaint.  *See id.* at 6.  That allegation duplicates the claim for retaliation contained in Count III and cannot serve as a stand-alone claim in Count II.  *See* Compl. ¶¶ 36–45; *see also infra* Section III.A.3.

Finally, Ward-Johnson alleges that she has many other disabilities that she did not make known to the Foundation.  Opp'n at 6.  It appears that she includes that remark in an attempt to bolster her allegation that she is disabled within the meaning of the Rehabilitation Act.  Of course, to state a claim for the denial of an accommodation, Ward-Johnson must allege not only that "she was a qualified individual with a disability," but also that "the [Foundation] had notice of her disability."  *Ward*, 762 F.3d at 31.  The Foundation cannot be liable for failing to accommodate a disability of which it was unaware.

     *b.*    *Disparate Treatment*

When Ward-Johnson applied for the Financial Analyst position in 2017, she submitted a note from her doctor stating that she is a person with a disability under 5 C.F.R. § 213.3102(u)

("Schedule A").[3]  The regulation states that "[a]n agency *may* [non-competitively] appoint, on a permanent . . . basis, a person with an intellectual disability, a severe physical disability, or a psychiatric disability."  *Id.* § 213.3102(u)(1) (emphasis added).  In other words, assuming that the Foundation had *wanted* to hire Ward-Johnson, it could have filled the position without considering other candidates.  *Id.*

But the regulation's language is permissive; there is no obligation to hire a disabled applicant.  "Schedule A provides the agency a means to avoid competitive placement but does not impose an obligation to use this authority in any specific case."  *MacDonald v. Cohen*, 233 F.3d 648, 653 (1st Cir. 2000) (citing *Van Wersch v. Dep't of Health & Human Servs.,* 197 F.3d 1144, 1146 (Fed. Cir. 1999)).  Failure to follow an affirmative action plan may be *evidence* of discrimination, but it does not state a claim on its own.  *See Rumburg v. Sec'y of the Army*, No. 10-11670, 2011 WL 1595067, at *9–10 (E. D. Mich. Apr. 27, 2011) (collecting cases).

Perhaps if the Complaint contained other allegations of disability discrimination, such as derogatory comments by management about disabled people or a stated desire to avoid hiring them, the failure to hire a Schedule A applicant might be serve as additional supporting evidence.  But the Complaint contains *no* allegations that the Foundation refused to hire Ward-Johnson *because of* her claimed disability.  Ward-Johnson even provides an alternative rationale herself: she alleges in Count V that the Foundation failed to hire her in reprisal for her equal employment opportunity activity.  *See* Compl. ¶ 71.

---

[3] The Foundation does not argue that the Rehabilitation Act's more rigorous definition of "a qualified individual with a disability," 29 U.S.C. § 794, applies to eligibility for hiring preference under EEOC regulations.

### 3.    Retaliation

The Complaint contains two separate counts for retaliation.  Count III alleges that after Ward-Johnson filed her first equal employment opportunity complaint in August 2016, her supervisors and co-workers (1) failed to accommodate her disability, Compl. ¶ 37; (2) told her that her term would end after the first year (though no one followed through on the threat), *id.* ¶ 38; (3) did not invite her to meetings, *id.* ¶ 39; (4) mistreated her, *id.*; and (5) told her (months in advance) that they would not renew her employment at the end of her two-year term, *id.* ¶ 40.

To state a claim for retaliation, Ward-Johnson must adequately plead that "(1) she engaged in activity protected by Title VII [or the Rehabilitation Act]; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights."  *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006); *Spector v. District of Columbia*, No. 17-cv-01884, 2020 WL 977983, at *9 (D.D.C. Feb. 28, 2020).  The bar to plead retaliation is lower than it is for discrimination; Ward-Johnson must only plausibly allege actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 63, 68 (2006).  Of course, she must allege material harms rather than "petty slights, minor annoyances, and simple lack of good manners."  *Burlington N.*, 548 U.S. at 68.

As to the accommodation of her disability, Ward-Johnson has not plausibly alleged that her administrative complaint caused the alleged denial.  A plaintiff may state a claim that her exercise of protected activity caused the ensuing harm by pleading that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity."  *Holcomb*, 433 F.3d at 903 (internal quotation omitted).  Ward-Johnson requested her accommodation in February 2016.  Compl. ¶ 25.  She filed her initial informal complaint with the Foundation in August, *id.* ¶ 36, and received the accommodation on

September 19, *id.* ¶ 33.  It cannot be the case that the alleged denial of an accommodation, which

persisted for six months *before* the protected activity, constituted reprisal for that same activity.

*See Duberry v. Inter-Con Sec. Sys., Inc.*, 898 F. Supp. 2d 294, 299 (D.D.C. 2012) ("[A]s a matter

of law and logic, the subsequent event could not have caused the preceding event.").  That's

especially true when Ward-Johnson obtained her requested accommodation within a month of

filing the informal complaint and was on leave for more than ten days during the intervening

period.  Compl. ¶¶ 25, 29, 33.

As to the potential early termination, Ward-Johnson's pleadings give little information:

"The Agency also informed me that my appointment would end in one year; but would not give

me a reason why.  I was on a two-year term appointment (with conversion after a two-year

completion).  However, they wanted to end my employment after one year."  Compl. ¶ 38.  That

allegation alone cannot support a claim for retaliation, as there is no indication of who made the

decision to let Ward-Johnson go, who informed her of the decision, or when the Foundation

changed its mind.  In any case, because she was never terminated, *id.* ¶ 39, there was no adverse

action that might constitute retaliation.  *See Baloch*, 550 F.3d at 1199 ("courts have been

unwilling to find adverse actions where the suspension is not actually served").

In her briefing, Ward-Johnson adds that she was eligible for conversion from a term

appointment to a permanent appointment after *one* year but did not receive it, and that the failure

to convert her in November 2016 was itself retaliatory.  *See* Opp'n at 6.  But there is no rule that

agencies must convert Pathways participants after one year.  *See* 5 C.F.R. § 362.301 ("The

Recent Graduates Program provides an entry-level development experience designed to lead to a

civil service career in the Federal Government after successfully completing 1 year under the

Program, *unless the training requirements of the position warrant a longer and more structured*

*training program* . . . [which] may not exceed 2 years." (emphasis added)).  In fact, there is no

rule that they must be converted to a permanent position at all.  *See* 5 C.F.R. § 362.107(f)

("[S]ervice in a Pathways Program confers no right to further employment in either the

competitive or excepted service.").  Ward-Johnson's conclusory allegations therefore cannot

support a claim of retaliation.  The same goes for Ward-Johnson's bare allegations that she was

not invited to meetings and that others "mistreated" her, Compl. ¶ 39, which do not meet the

basic pleading standard of Federal Rule of Civil Procedure 8.

Finally, Ward-Johnson alleges that an employee named Arlene Williams told Ward-

Johnson in April 2017 that she was going to lose her job in November.  Compl. ¶¶ 40–42.  It's

unclear what position Williams held or whether she exercised any authority over Ward-Johnson,

though the Complaint does imply that she was a "member of the management team."  *Id.* ¶¶ 41–

42.  According to the Ward-Johnson, Williams attended a private meeting in which Glin

conveyed his intention not to renew Ward-Johnson's employment at the end of her term.  *Id.*

¶ 42.  She relayed that information to Ward-Johnson but mentioned that she was "in fear of

losing her job," asking Ward-Johnson not to disclose her identity to others.  *Id.* ¶ 41.

Even if telling someone in advance that she was going to lose her job were actionable

retaliation (and it could very well be), it appears that no supervisor ever said such a thing to

Ward-Johnson.  She heard it from an anonymous source.  Compl. ¶ 41.  The allegation that Glin

might have *decided* to terminate Ward-Johnson months before he did so might support the

retaliation allegation contained in Count V, which deals with Ward-Johnson's eventual loss of

her job (and which the government does not challenge at this stage).  *See id.* ¶¶ 58–71.  But

absent an allegation that some official who had the authority to end Ward-Johnson's employment

actually communicated the threat to her and thereby "dissuaded [her] from making or supporting

a charge of discrimination," *Burlington N.*, 548 U.S. at 68, Count III does not state a claim and will be dismissed.

## B.      Motion to Amend

After briefing concluded on the Foundation's Motion to Dismiss, Ward-Johnson moved for leave to amend her Complaint. *See generally* Mot. to Amend. She states that she was 42 years old when she was hired in 2015 and therefore that the discrimination against her is also barred by the ADEA. *See id.* at 2. Under the ADEA, it is "unlawful for an employer . . . to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] age." 29 U.S.C. § 623(a)(1). The Act's terms only apply "to individuals who are at least 40 years of age." *Id.* § 631(a).

The ADEA charges the EEOC with enforcing the Act's prohibitions as to federal employment. *Id.* § 633a(b). Before filing suit, a plaintiff must give the EEOC thirty days' advance notice, and "[s]uch notice shall be filed within one hundred and eighty days after the alleged unlawful practice occurred." *Id.* § 633a(d). More than a year and a half has elapsed since Ward-Johnson lost her job, and she has not filed any notice with the EEOC, nor did she raise any theory of age discrimination in her administrative complaints or EEOC appeals. *See generally* 1st EEOC Appeal; 2d EEOC Appeal; 29 U.S.C. §§ 633a(b)–(c) (permitting EEOC complaint to serve in lieu of notice to sue); *Stevens v. Dep't of Treasury*, 500 U.S. 1, 6 (1991) (discussing advance-notice rule). The Foundation argues that the proposed amendment is thus futile because Ward-Johnson failed to exhaust administrative remedies and is now barred from raising the unexhausted claims here. *See* Def.'s Opp'n at 4 (citing *Barrett v. Pepco Holdings*, 275 F. Supp. 3d 115, 120 (D.D.C. 2017)). To support that argument, the Foundation attached affidavits from officials at both the Foundation and the EEOC averring that they have no record

of any age-discrimination claims from Ward-Johnson. *See generally* June B. Brown Decl., ECF No. 17-1; Dexter Brooks Decl., ECF No. 17-2.

Ward-Johnson did not reply to the Foundation's Opposition and thus does not engage with the exhaustion argument. "The court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), but leave need not be given when the new claims would not survive a motion to dismiss, *Foman*, 371 U.S. at 182. Ward-Johnson's proposed ADEA claims would be barred for failure to exhaust, so the Court will deny leave to amend.

## IV.     Conclusion

Ward-Johnson's pleadings adequately state a claim for a hostile work environment under Title VII and the Rehabilitation Act, but they do not support claims for disability discrimination or pre-termination retaliation. The Foundation does not challenge Ward-Johnson's claim of retaliation related to her termination. Finally, Ward-Johnson's proposed age-discrimination claims are procedurally barred. Accordingly, it is

**ORDERED** that Defendant's Partial Motion to Dismiss is **GRANTED in part and DENIED in part**. Counts II, III and IV are **DISMISSED** without prejudice; it is further

**ORDERED** that Plaintiff's Motion to Amend is **DENIED**; it is further

**ORDERED** that Plaintiff's Surreply to the Motion to Dismiss, which the Court construes as a Motion for Leave to File a Surreply, is **DENIED**.

An Order will be released contemporaneously with this Memorandum Opinion.

DATE:  May 28, 2020

CARL J. NICHOLS
United States District Judge